Good morning. I am Eugene Schneider. I am the appellant in this matter, appearing in pro se. I think my first issue is the one of the application of California law in determining at the outset whether there was a contract. The appellee has constantly argued I am attempting to rely on California law to determine if there is a non-dischargeability or dischargeability of a claim. I do not claim California law determines non-dischargeability. Excuse me, counsel. I had better, before I run out of time to ask you questions, ask a couple that are on my mind. First of all, I have a cold, so get well soon. Did you wind up getting paid anything in this case? What? Did you wind up getting paid any compensation for your legal work? I did receive some, yes, but I deferred on the balance. It is not of record, but I did defer because it was a claim for a need of some of the proceeds because not all of the proceeds were received at the same time. Okay, but you did get paid in part. I did get paid some, yes. But you did not get paid according to your contract. Correct. As I recall, your deal started off at an hourly rate, and then she wasn't paying the hourly rate. She said she wouldn't pay it unless you took it out of whatever she won, and you said, well, that's more like contingent fees, so I want a percentage on top of my hourly rate. Have I got the facts right? I do not recall what preceded the modification to the contract that resulted in the contract that's in issue today. It may well have been that. Whatever it was, there was that modification, and I believe, if I recall correctly, I followed California law when there's a modification advising her of her right to seek counsel on that issue. In California, if your attorney's fees written agreement with a client turns out for one reason or another not to be enforceable, can you still recover quantum merowit? Yes, that's my understanding. But you have not put your claim as a quantum merowit claim. You've put it as non-dischargeability in bankruptcy because of fraud, and that's what we're supposed to decide, right? Well, bear in mind that there's a case pending in the state court that is on hold pending the determination of this case. That was ongoing at the time she filed her bankruptcy, and it was in response to that case that she filed the bankruptcy. So your quantum merowit claim, if any, would be in the state case, and it would be immaterial if her discharge in bankruptcy stood up. Is that right? That would be my belief, yes. On the fraud, it looked to me as though the core issue and what turned the court was whether her brother adequately advised her of what your contract said were the terms of employment. And I'm not clear on this. Did anyone call the brother as a witness to find out whether he could understand English well enough or not? I did not because I wasn't even required to have her under California law. I wasn't even required to suggest that there be a translator. Under the California law that I cited, and there's also a subsequent case of Ramos, which is similar to that. It had a different outcome because the facts were different. But California law in this regard is consistent with federal law that if you sign a contract that you are obligated for its terms and you cannot claim later, oh, I didn't understand it, unless there's some ambiguity or something that requires interpretation. There has never in this case been a claim that there was a misunderstanding that this was a contract for services. There has never been a claim that the contract had any ambiguity. You're talking now about the general principle that if you sign it, you're bound by it whether you read it and understood it or not. Is that right? Correct. Okay. I'm really more interested in whether in the particular context of a lawyer's fees agreement, the lawyer would have to make sure that the client understood what she was agreeing to pay. There isn't California law that says the lawyer does have some responsibility for that? I know of no specific law in California. There are laws with respect to when a contract is required under the Business and Professions Code. And generally speaking, that is when the anticipated fees will exceed $1,000 or if the past experience of the parties is such that the terms of the agreement are understood. Now, in the bankruptcy context, since you're opposing the discharge on grounds of fraud, I would have thought that the burden would be on you to prove fraud. Am I missing anything there? No. And the fraud is she intended never to pay you? Say again? The fraud alleged is that even though she obtained your services by signing an agreement, her intent was never to pay you. Never to pay me the balance owed. But, again, you see, and this is why in my reply brief I responded to Respondent's Brief on this issue. And I think this is one of the, in addition to the fact that the Court overlooked that, in my opinion, California law applied to determine whether there was a contract. As I noted in my reply brief, in this regard, the law relative to intent in bankruptcy is similar to what we have in so many other areas of the law. For example, in the felony murder rule, you may be a participant in a felony. One of your co-conspirators can kill someone. Even though that was not any of your intent in engaging in the felony, you are nonetheless liable for that unintended consequence. I agree with you, but let me narrow it down to what's on my mind here. The judge made what looks like a finding of fact. He says it's a finding of fact, that the Court is not persuaded that the brother's command of the English language was sufficient to avoid what your client said was confusion or misunderstanding. Now, when I look at her testimony, it frankly does not look credible. Again? When I look at her testimony, it looks as though there are real credibility problems. She purports not to remember things that she'd have to remember to say what she was saying. Whenever any answer would be adverse to her, she doesn't understand that whenever it's helpful, she does understand. Nevertheless, we've got a clearly erroneous standard. And then on this brother business, the judge says you haven't proved that he doesn't understand English well enough to have explained the agreement to her. What evidence is there that makes that finding clearly erroneous? Two answers to that. Number one, under California law, that's irrelevant. Number two, she chose the person to interpret the contract and by her own testimony, not only at that time, but in the ensuing six years, she continued to use her brother to interpret and assist her even though she contends he never really sufficiently understood the English language or to translate it into Punjabi so that he could be relied on. So the question comes down to if you know somebody is not reliable in performing a task, why do you choose them? That has a question. Let me stop you. I'm sorry. Are we talking about, though, in the context of fraud? Because in essence, you know, your argument to us is that the bankruptcy judge erred in the bankruptcy judge's determination in regards to fraud. Isn't that correct? I'm sorry. I have trouble hearing you. I've got a cold and bad hearing to start with. I'm getting beyond the point where I should be doing this. Isn't the point in front of the bankruptcy court the issue of fraud? Because you want to prevent dischargeability because of fraud. And whereas you're arguing now about contract law, which is fine and dandy, but it's not really the issue that was in front of the bankruptcy court. The contract law was the viability of the contract was what the court focused on. The court said that there was no proof of an intent to deceive, which is critical in bankruptcy court. There was no proof of an intent to deceive. You didn't meet your burden of proof. But that's my point. That's where I think the implied intent comes in. Well, in fraud, you have to show actual fraud, intent to deceive from the beginning in bankruptcy court. You're arguing contract law under state law, which is, you know, that's what dischargeability in bankruptcy is all about. This is why in my reply brief I cited the federal cases that stated you did not have to prove actual fraud in order to establish five elements. You could imply the intent from the actions. All right. So let's get down to a couple of other things. Your time is running down, so I need to ask you a couple more questions. First, the bankruptcy court made a finding that the funds were dispersed to you from the probate. Is that true? Some of the funds were dispersed to me as trustee. Yes. And so then the bankruptcy court also made the finding that your collection efforts could not have been impeded because you had control of the funds. That's the finding. No, no. Let's back up. When I'm holding funds in trust, I do not have control of the funds. Under California law. Is that right? At least the way it always worked in Alaska was when you had a contingent fee or any kind of fee agreement, usually the defendant would write a check to you and your client. You'd have the client sign it. You'd deposit it in your trust account, and then you write two checks out of your trust account, one to yourself for your fees and expenses and the other to the client for what's left. This was different. I received the funds from the probate as trustee for the benefit of the client. They were in my IOLTA account, and I do not have any control whatsoever in my IOLTA funds. Don't you write the check on the IOLTA account? Pardon? Don't you write the checks on the IOLTA account? Only when the client instructs me to do so. I cannot do anything with my IOLTA funds unless I have the client's authority. Sure, so you bring in the client, you bring in the client, you bring in the client, and you make a closing statement about what the fees are owed, and you disperse them out of the account. That didn't happen here. I do not have the power to tell the client how to disperse those funds. It is the client's determination under California law. Actually, I don't think you're correct on that. Pardon? You have to. You have to keep the funds in trust, but this is a common occurrence in any contingency fee agreement that you take the money in the trust for the client, and then the lawyer at the closing, you say, here are signs off on the closing. You didn't, you just, you know. That was not a part of this agreement. There was nothing in this agreement that gave me any control whatsoever over the funds. And did you testify to that? Pardon? Did you testify to that? The issue was never raised. It's just like the issue on the amount of the fees. There was evidence presented unopposed as to the amount. I testified as to the amount. There was no follow-up question. There was no discovery. There's a procedure in federal prior during pretrial proceedings for asking for proof of an amount. That was never done. He asked me what was the damage. I testified to the damage. There was no subsequent question to that. I was not asked how did you arrive at that. I was not asked anything. If you look at that, when I answered that question, he didn't ask another question on that issue. It was not until after he made his motion and the judge said, well, you didn't prove it, I wasn't asked to prove it. Period. Your time has expired. Thank you. Good morning, Your Honor. My name is Raymond Miller. I represent the appellee, Satya Jaggar. Mr. Jaggar was the debtor in the underlying bankruptcy case. The trial court, as Your Honors are well aware, entered an extensive memorandum decision. Supporting our motion and, in short, determined that the plaintiff, in this case the appellant, Mr. Schneider, failed to prove any important fact that he needed, starting with his fees. I need to ask you a couple of questions. First, when I read this case, I thought, how could anyone believe that she doesn't have to keep paying the lawyer when the lawyer keeps working? If she thinks she doesn't, why isn't that a fraudulent intent not to pay the lawyer? Because, obviously, he's tendering something about paying his fees and she intends not to pay them. That's literally not true. How could anyone think that they're going to get the legal services for free? My client never testified to that, Your Honor. Well, it wouldn't take testimony if I ran a landscaping service and somebody asked me to mow their lawn and I mowed the lawn, it wouldn't take testimony for anybody to infer from those facts alone that I expected to get paid for mowing the lawn. Why is this different? Well, the appellant was paid directly by funds he was collecting through the probate process for a number of years. He got the money directly. He dispersed a portion of that to her as he got each payment. How much did he wind up getting? Your Honor, I could never determine that. I know it was well in excess of $210,000. Well, sure you could determine it because the probate records are public. That's true, Your Honor, but we didn't determine the amount, but that was our best estimate. We have an exhibit at page 180 in our exhibits that is one example of a check that the appellant received. It's approximately $102,000, and of that amount, he provided approximately $32,000 to my client. He kept the rest for his fees. And this was the pattern he had engaged in over the number of years. Okay, let me ask you another thing. The judge found that the brother doesn't speak English well enough to be of much help to her, but as far as I could see, he never heard from the brother. The brother never testified. Is that correct? That's correct, Your Honor. How could that finding be based on the evidence? Well, the appellant put it on his case. What he's got is some hearsay. Her relative says, my brother doesn't, the brother doesn't speak English well enough, and the brother of the decedent, I think it was, says he did speak English well enough, but the judge never hears the brother. Nobody asked the brother to testify, Your Honor, and we didn't need to put it on our case because our motion for a directive verdict was granted. But the problem was that the appellant failed to even testify himself about the amount of his damages, about the amount he was owed. In fact, I did ask him one question on that, and he said he's owed a lot. I didn't ask him anymore. I didn't need to because it was his burden to prove his case in the first place. My client didn't dispute there was a contract written. She said, yes, I signed it. My brother told me what it was. Let me ask you, when you say the contract, what exactly, which contract are you referring to? Well, that's a good point, Your Honor, because there were three letter contracts over a number of years, and in our understanding. Let me stop. I thought there was one written contract and then two letters that were signed. The letters appeared to supplant the previous agreements, and the very last agreement or letter agreement is how I'm referring to it. The brother apparently related to our client that he has to pay the attorney, and she has to pay the attorney, and she understood it as being 7.5 percent of the total. We aren't arguing that there wasn't a contract. There was a contract. The problem here is the appellant collected all the money and dispersed the amounts to her as they came in. He didn't testify about an amount or show anything about how he was damaged or for fraud. The client wasn't arguing that there wasn't a contract because she didn't understand English. We never argued that. We never presented that as part of our case. The problem here is that. . . Well, I don't know if you can make that last statement. There was a contention that she did not understand English sufficiently, and that's one of the reasons why she had to have her brother assist her in the fashion. The question is to the extent to which he did assist her in the fashion. Is that the situation? Well, that's true, Your Honor. Her English is very poor, and the brother helped her. I never met the brother. I talked to him on the phone a couple times. I'm not here to testify because that wouldn't be proper, but that's all I know about the brother. I noticed that her income consists in large part of rents, and that implied to me that she owned property in order to rent it out. Was that so, and what kind of property? Well, Your Honor, she was. . . I didn't look at the bankruptcy petition to find out. She was receiving Social Security because her husband had died, and so were her children. Well, what about the rents? I'm asking about the rents. Well, after she received a certain amount of income from the probate action, she purchased a small, modest house, and she was trying to rent out a room. That didn't go very well for her because the renter paid one month and then refused to pay, and she had to pay an attorney to evict them. There was only one instance of a rental issue. It was, I believe, $600, and she never got paid any more rents. I have nothing further. I would reserve the balance of my time for any rebuttal if necessary. So what amount did you list on the schedules that was owed to Mr. Schneider? I believe we listed the amount that he was claiming in his state court action, which was about $200,000. My memory is failing me right now. And did he file a proof of claim? It was a Chapter 7, no-asset case, so there was no claim deadline to file a claim. I didn't read the schedules that way, that there were no assets. Am I reading those incorrectly? The client had a retirement account, which all the money came from a retirement account rollover from her deceased husband, and that was the bulk of the estate along with receiving Social Security every month. Right, but with every Chapter 7 case with which I'm familiar, you still have a claim deadline, proof of claim deadline, even if there aren't any assets to disperse. My recollection is there was no request for creditors to file a claim. Was this a single credit or bankruptcy? I think there may have been one or two other minor creditors, but this was certainly the bulk of the creditor claims. There's something else that bothers me about this case. There are plenty of people in America, and especially a large number of people in California, for whom English is not their native language. Go around Alaska, you could find people whose native language is Inupiat or Aleut or various varieties of Athabaskan. People have all kinds of languages, Korean, Tagalog, all kinds of languages, and I'm just talking about Alaska, not a big immigration state. And I'm thinking, how is a lawyer supposed to get retained and settle upon his fee in order to satisfy the bar requirements that there be a written engagement with the fee set without the lawyer hiring some sort of certified translator? And since most of the people who come in with claims don't have huge ones, I don't see how a lawyer can represent them and be confident of getting paid. Unless he's getting paid by the Ford Foundation or something, I don't see how he can live if he represents people who don't speak English as their native language under your theory of the case. They can just say, I didn't understand, and go bankrupt and discharge the lawyer's claim, and they get the benefit in this case of a fortune that the lawyer got for them, and they don't pay for that work that produced it. Well, Your Honor, the fact is the appellant did collect numerous checks through the course of the probate action, and he took his fees out as he went forward. And his client got a lot more. She got enough to buy a house in Southern California. I can't remember exactly how much did she wind up with. It looked like she won a big case. Well, this is all through the inheritance from her husband. Yeah, which was strongly contested, but her lawyer won her side of the argument. Well, it's a modest house in Northern California. How much did she get? How much money did she get? In rereading the papers this morning, I recall that the appellant's argument was that she received $600,000. That's what I remember. That's the number I'm remembering right now. That's what I remember, too. How could anyone believe that if a lawyer gets her $600,000, she doesn't have to pay him while he's doing the work to get it for her? Well, if the appellant felt he was owed more money, it would have been nice if he had sent her letters saying he's owed more money, which he never did. He didn't have any letters, in fact. I thought he had an original engagement and two letters that she co-signed. I mean, when the probate case concluded, there was no follow-up letter saying you owe me more money. Oh, so you're saying, yeah, he did send her letters, but when she just continued to refuse to pay him, he didn't send her another letter saying, pay me. No, I'm saying there were engagement letters, but after the case was completed, he did not send a dunning letter or a collection letter to her saying, this is how much I'm still owed. So she would have to think the engagement letters were irrelevant, didn't matter. Her belief was that she had already paid him everything. Why would she think it was everything? He's still working and she's not paying. Well, when he completed his work, he had received the checks. He had taken his portion each time each check was received. Well, wasn't it correct that the original agreement was that he was going to try to get her some assets from the probate proceeding, and that if he was successful, the probate judge would pay him, and so she didn't have to worry about direct payments, and that if he was not successful, it was only then that he would be charging her $300 an hour. And that was the original agreement, although later on the agreements changed, but that was her initial, if she understood it, her initial understanding. Is that correct? That's my understanding, Your Honor. Anything further? Thank you. Thank you. The case just heard will be submitted for decision and will be in recess for the morning. All rise.
judges: Kleinfeld, Thomas, Wu